UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80137-CR–RYSKAMP/HOPKINS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JUAQUIN MOLINA,

    Defendant.

_____/

FILED by ___ D.C.

DEC 2 0 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS SEARCH OF RESIDENCE (DE 150)

**THIS MATTER** is before the Court on reference from Senior United States District Judge Kenneth L. Ryskamp. (DE 103.) Before the Court is Defendant's Motion to Suppress Search of Residence (DE 150). The United States responded to the motion. (DE 159). The Court held a hearing on Defendant's motion on November 30, 2010. Now, having fully considered the parties' arguments and evidence, and considering the governing law, the Court RECOMMENDS that the motion be denied as discussed below.

### BACKGROUND

The Court makes the following findings of fact:

On September 23, 2010, the Defendant was indicted on one count of conspiring with his supplier, Jose Orozco, and Orozco's drug couriers, Luis Martinez-Resendiz and Roberto Ramirez Perez, to possess with intent to distribute at least five hundred grams of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §846 and §841(b)(1)(B). (DE

1

40).

At the hearings the Defendant, DEA Supervisory Special Agent Joseph Dubois, Palm Beach Sheriff's Office (PBSO) Agent John Bango, and PBSO Deputy Miguel Corzo testified (DE 167).

From August 20, 2010 through September 10, 2010, agents of the Drug Enforcement Administration (DEA) and Palm Beach County Sheriff's Office (PBSO) conducted a court-authorized wiretap of a cellular telephone utilized by Jose Orozco. From August 23 to September 8, 2010, Orozco and the Defendant Molina had several phone conversations wherein Molina ordered ounces of cocaine. The Defendant, who is approximately five feet tall, was referred to by a Spanish word meaning "short person" or "midget." The Defendant was purchasing cocaine in order to re-sell it on the streets. Following some of the phone orders, surveillance agents followed Orozco's drug couriers to Molina's residence at Mee Court in Lake Worth, Florida, and observed the couriers going inside to deliver the cocaine.

At around 10:00 a.m. on September 10, 2010, PBSO Agent Bango and Deputy Miguel Corzo, who speaks Spanish,[1] and other law enforcement officers went to Juaquin Molina's Mee Court residence to arrest Molina and execute a state search warrant (GX3). Upon arrival, Agent Bango checked the legal description of the Mee Court residence on the warrant and realized that it contained errors. Agent Bango contacted an Assistant at the Palm Beach County State Attorney's Office and learned that the legal description could be corrected and that Bango could obtain a new search warrant from the same judge who was still on duty and available. Agent Bango determined instead

---

[1] Deputy Corzo was born in the United States to parents who were Cuban immigrants. Corzo grew up regularly speaking Spanish in the home and at his father's business. He also regularly speaks to his wife, who is from South America, in Spanish. Although Corzo does not read or write Spanish, he speaks the language fluently. Supervisory Special Agent Dubois grew up and went to school in Mexico and is completely fluent in Spanish.

to seek Molina's consent to search the residence. If Molina had refused to consent, Bango would have secured Molina's residence and obtained another search warrant using the correct legal description.

At 10:12 a.m., Agents Bango and Corzo knocked on Molina's front door. As they waited for Molina to answer the door, Bango dialed the cell phone number used by Molina to contact Orozco during the wiretap. When Juaquin Molina opened the front door, Agent Bango heard Molina's cell phone ringing. Molina turned toward a table near the front door to pick up the cell phone. In English, Agent Bango told Molina not to worry because he was the person calling Molina's phone, and he asked the Defendant to step outside.[2]

Agent Bango was dressed in plain clothes. A PBSO police badge identifying Bango as an agent hung from his neck. Agent Bango stood next to Deputy Corzo, who was dressed in a PBSO police uniform.

Molina was home alone on the morning of September 10th. Bango advised Molina that he was under arrest. Agent Bango put the Defendant in handcuffs in front of him and conducted a quick pat down search and determined that Molina was unarmed. Agent Bango had brought Spanish speaking Deputy Corzo with him to act as an interpreter. Agent Bango asked Molina if he would speak to him. Molina said that he would. Bango asked Molina whether he wanted to speak to him outside or inside the residence, and Molina said that he wanted to talk inside. Agents Bango and Corzo entered the residence with Molina. The three of them sat down in the living room. Agent Bango directed another officer to position himself in the kitchen for security purposes. Once the

---

[2] Agent Bango obtained his cellular telephone bill from PBSO (GX10) which documents his call to Molina's cellular telephone on 10:12 a.m. on September 10, 2010.

three men were seated, Agent Bango turned on a tape recorder and placed it in front of Molina. Agent Bango then spoke to Molina through Agent Corzo. The entire conversation was recorded and a translation/transcription of the tape was entered into evidence. (GX2). After considering the tape, the transcript, and the testimony of Agent Corzo and Supervisory Special Agent Dubois, it is apparent that the following transpired during the conversation at the Defendant's residence.

The Defendant was calm and cooperative. Agent Corzo told Molina that the police were from the Sheriff's Office and that Molina was being arrested (Tr. at 1). Bango presented Corzo with a Rights Waiver Form in English (Tr. at 2). Agent Corzo asked Molina whether he knew how to read in Spanish and Molina said, "No." (Tr. at 2-3). Agent Corzo explained to Molina that he had the right to keep silent and everything that he said had to be voluntary (Tr. at 3); that he had the right to an attorney before he said anything (Tr. at 3); that if he could not get an attorney, he had the right to get an attorney from the court before he said anything (Tr. at 4); that if Molina did not want to answer the questions that he was asking, Molina had the right to keep silent (Tr. at 5); that the agents could not hurt him and that everything Molina said had to be voluntary. (Tr. at 5). Molina was also advised that what he said could be used against him in a court of law. (Tr. at 6). Agent Corzo repeatedly asked Molina whether he understood everything about the rights that he was explaining to him, and Molina indicated that he did. (Tr. at 3-7).

When asked about his date of birth, Molina at different times responded that he was born in 1963, 1964 or 1973 (Tr. at 9-18). Agent Bango then advised Molina through Agent Corzo that he would like him to cooperate and that it would be in his best interest (Tr. at 18). Before questioning Molina, Bango advised him that he was aware of Molina and what Molina had been doing. Bango said that they knew Molina had been buying drugs from a person and reselling the drugs from his

4

house (Tr. at 20-22). Bango told Molina that Molina's drug supplier used the names Raul, Jose, or Willie (Tr. at 22). Bango said that Molina's phone had called him (the supplier) and they had pictures of Molina purchasing cocaine from his house (Tr. at 23). Bango said that he knew that Orozco used two men to bring Molina the drugs in a tan Toyota and that the men had brought Molina drugs when he was having a barbeque at his home (on September 6, 2010) (Tr. at 24). Molina was also advised that the agents had been listening to his telephone and had recorded his calls (Tr. at 25). After Agent Bango provided Molina with the circumstances leading to Molina's arrest, Molina was asked whether he understood (Tr. at 26). Molina said that he did not know any of the people referred to by the police (Tr. at 26-27).

After Molina denied knowing what Agent Bango was talking about, Bango asked Molina for consent to search his residence (Tr. at 27). Agent Corzo asked Molina in Spanish, "he wants to know if you give permission to check your house (Tr. at 27). Agent Bango asked Molina if he would sign a paper allowing them to look inside his house (Tr. at 27). Agent Corzo asked Molina in Spanish, "and if you sign a piece of paper giving permission for their checking your house (unintelligible) your apartment here" (Tr. at 27). Agent Bango said, "advise him it would be in his best interest if he would cooperate," and Agent Corzo interpreted that as "[i]t turns out better if you ... help him in ... investigating this case (Tr. at 28). Molina responded (in Spanish), "Oh! Well he can check" (Tr. at 28).

Agent Bango provided a consent to search form in English to Agent Corzo because Bango did not have a Spanish version of the form (Tr. at 29). Agent Corzo told Molina, "he [Bango] says he's sorry he doesn't have one that says in [sic] Spanish, but that one is saying you're giving permission to ... to check the house, it says ... this is the address of the house and everything, and ...

you are not asking for anything, it says you are giving permission to check the house. Do you understand?" (Tr. at 29). Molina said he understood (Tr. at 30). Corzo told Molina, "Okay, you understand you ... you are giving ... you are (unintelligible word) letting go of your rights to give permission to them to check your house" (Tr. at 30). Molina said, "Okay." Corzo again asked Molina, "You understand all that?" and Molina affirmed (Tr. at 31). Corzo interpreted for Bango, "[h]e [Bango] would like you sign [sic] here, but he is not ... forcing you to have you sign [sic] (Tr. at 31). Molina said, "Okay" (Tr. at 31). Agent Bango expressed his thanks to Molina through Corzo (Tr. at 32).

After Molina gave consent to search the residence, Agent Bango asked Corzo to find out from Molina whether there was anything in the house and whether he would tell them where it was so the agents would not have to destroy the house (Tr. at 32). Molina told Corzo that he did not have anything inside the house. Specifically, Molina said that there was no money or drugs inside (Tr. at 33-37).

Agent Corzo then explained to Molina that they were going to stop the recording to check the apartment (Tr. 37). Molina also identified his bedroom for the agents (Tr. at 39). Agent Corzo told Molina that "he [Bango] is going to ... be back in a little [sic] when they check everything," and Molina said, "Okay." (Tr. at 40).[3]

During the search of Molina's residence, agents seized Molina's cellular telephone from the console near the front door and a plastic bag containing approximately two grams of white powder,

---

[3] Molina also signed a consent to search form, written in English, at 10:39 a.m. on September 10, 2010 (GX4). The PBSO dispatch printout (DX1) reflects that the events occurred subsequent to the times reflected in the cell phone record (GX10), the consent form, and the officers' testimony, but the discrepancy appears to be due to a lag in dispatcher entries.

which field tested positive for the presence of cocaine, from between the sofa cushions in the living room.

According to his FCIC printout (GX6), Molina was previously arrested in Palm Beach or Martin Counties for the following offenses: (1) on November 17, 1996, for trespassing and larceny; (2) on January 8, 2000 for DUI; (3) on September 10, 2000 for possession of controlled substances without a prescription; (4) on July 16, 2001 for a probation violation associated with the DUI; and (5) on September 9, 2001 for driving while license suspended. The FCIC report also reflects that Molina has used variations of his true name as well as two alias names; one alias date of birth; and a social security number which according to the Social Security Administration was not assigned to him.

## ANALYSIS

**A.** Standing

At the hearing the Defendant testified that he resided at the searched premises. Consequently the Government did not contest the Defendant's standing to challenge the validity of the search.

**B.** Consent to the search

Warrantless searches of a suspect's residence may properly be conducted and their fruits utilized if the resident voluntarily consented. *Schneckloth v. Bustamonte*, 412 U.S. 219, 224-26 (1973). Voluntariness is based upon the totality of circumstances, none of which is dispositive, including a defendant's background, comprehension of his rights, cooperativeness with police, attitude concerning the likelihood of the police's discovery of contraband, and the length and manner of proceedings preliminary to the defendant's grant of permission. *Id.* at 226. Other factors

considered by the Eleventh Circuit are the voluntariness of the defendant's custodial status and the defendant's awareness of his right to refuse to consent to the search. *Blake v. United States,* 888 F.2d 795, 798 (11th Cir. 1989); *United States v. Simms,* 385 F.3d 1347, 1355 (11th Cir. 2004), *cert. denied,* 513 U.S. 988 (2005); *United States v. Holmes,* 270 Fed.Appx. 767 (11th Cir. 2008).

Although sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, *see Schneckloth,* 412 U.S. at 240, n. 29, 93 S.Ct. at 2055, n. 29, "custody alone has never been enough in itself to demonstrate ... coerced ... consent to search." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

While consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 234, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (upholding refusal to suppress fruits of car search despite fact that consent was obtained without informing car owner of right to refuse search). *See also United States v. Drayton,* 536 U.S. 194, 206-07, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (no presumption of invalidity where person consents without explicit notification of right to refuse); *United States v. Grap,* 403 F.3d 439, 443 (7th Cir.2005)(valid consent even though no advice of right to refuse consent).

In *United States v. Jones,* 523 F.3d 31 (1st Cir.), *cert. denied,* 129 S.Ct. 228 (2008), the First Circuit determined that the Jones's consent to search his motel room was knowing and voluntary. In *Jones,* U.S. Marshals executed a warrant and arrested Jones in a motel room for which they did not have a search warrant. *Id.* at 37. Jones was advised of his *Miranda* rights and acknowledged that he understood them. *Id.* Jones did not appear intoxicated, even though there was marijuana in plain view, and appeared to understand what was going on. *Id.* No officer extracted Jones's consent

to search the motel room through threats or promises. *Id.* Despite the fact that ten to fifteen agents, with guns drawn, entered his hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him and did not advise him of his right to refuse to consent, the First Circuit found that "the circumstances were not so inherently coercive as to render Jones's consent unknowing or involuntary, even when considered together with the officers' failure to advise Jones of his right to refuse consent." *Id.* at 38. *See also United States v. Barnett*, 989 F.2d 546, 556 (1st Cir. 1993)(*Miranda* warnings to arrested defendant put him on notice that he could refuse to consent to search).

In *United States v. West*, 458 F.3d 1, 14 (D.C. Cir. 2006), where nothing that the police officer said indicated a command to consent to search and the police officer asked for permission to check his luggage, the D.C. Circuit concluded that this indicates to a reasonable person that he was free to refuse consent.

In the instant case the Defendant Molina was advised of his *Miranda* rights and was told that the agents could not hurt him and that everything that he said was voluntary. He was asked for permission to check his house and also told that he was giving up his right to give permission to check the house. Molina cooperated and said that the officers could search but there was no money or drugs in the house. Molina was calm and so were the officers. The Defendant was cooperative and twice told the police they could check the residence. In addition, due to his criminal history of several arrests, he is likely very familiar with his rights. Considering all the circumstances it was a voluntary consent to search.

C. <u>Plain View</u>

The seizure of the cell phone was also appropriate under the "plain view" doctrine. This

9

doctrine permits the seizure of objects which fall within the "plain view" of an officer who has a right to be in the position to have that view. *United States v. Jonas*, 639 F.2d 200, 203 (5th Cir.1981); *United States v. Bolts*, 558 F.2d 316 (5th Cir.), *cert. denied sub nom Hicks v. United States*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also United States v. Watchmaker*, 761 F.2d 1459, 1472-73 (11th Cir. 1985)(seizure of scales in plain view from apartment entry permissible when officers lawfully attempting to serve arrest warrant).

Here the officers were lawfully attempting to arrest the Defendant by knocking on the front door of his residence. When they called his cell phone and he came to the door they observed him reach for the cell phone just inside the doorway. They were then invited inside and could lawfully have seized the cell phone under the plain view doctrine.

D. <u>Inevitable Discovery</u>

In order for evidence to qualify for admission under the inevitable discovery exception to the exclusionary rule, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. *See United States v. Virden*, 488 F.3d 1317, 1322-23 (11th Cir.2007) ("This circuit also requires the prosecution to show that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. This ... requirement is especially important. Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." (citations and

10

quotation marks omitted)). *See also United States v. Delancy*, 502 F.3d 1297, 1315 (11th Cir.2007) (requirement is met where detective was "actively pursuing" valid consent before the drugs were found).

In the instant case the officers had actively pursued and obtained a lawful search warrant, which due to an address error they were not able to execute. It is abundantly clear that those efforts to obtain a lawful search warrant would have culminated in a revised search warrant had they waited instead of securing consent from the Defendant. Thus the evidence from the residence should alternatively be admissible under the inevitable discovery exception.

## RECOMMENDATIONS

For the reasons stated above, this Court RECOMMENDS that the Defendant's Motion to Suppress Search of Residence (DE 150) be DENIED.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Senior United States District Judge Kenneth L. Ryskamp within fourteen (14) days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. *See United States v. Warren*, 687 F.2d 347, 348 (11th Cir.1982), *cert. denied*, 460 U.S. 1087 (1983).

**DONE** and **SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 20 day of December, 2010.

*James M. Hopkins*

―――――――――――――――――――――
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:
Hon. Kenneth L. Ryskamp
Counsel of record